**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH P. FOLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 03-CV-328** |
| | : | |
| **AMERICAN ELECTRIC POWER, et al.,** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | **Magistrate Judge Abel** |
| **Defendants.** | : | |

## OPINION AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment. On March 7, 2005, Plaintiff, Joseph P. Foley, and Defendants, American Electric Power Company, Inc. ("AEP"), AEP Energy Services, Inc. ("Energy Services"), American Electric Power Service Corporation ("Service Corp.") (collectively, the "Company"), American Electric Power System Incentive Compensation Deferral Plan, Melinda A. Ackerman, Thomas M. Hagan, and Henry W. Fayne, filed separate motions for summary judgment. For the reasons set forth herein, Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

## II.  BACKGROUND

### A.  Facts

In September 1998, pursuant to a two-year employment agreement, Plaintiff was hired as a senior energy trader by Defendant Service Corp., a subsidiary of Defendant AEP and an affiliate of Defendant Energy Services. Plaintiff's two-year employment agreement expired on September 8, 2000, and Plaintiff continued to be employed by the Company on an at-will basis, working first as a senior energy trader and then as Director of Energy Trading for the Company's "Gulf Desk." As Director of Energy Trading, Plaintiff was responsible for trading gas at

specified locations, and he supervised up to four other gas traders at a time.

While he was employed with the Company, Plaintiff participated in the AEP Energy Services, Inc. Phantom Equity Plan ("PEP"), an incentive plan designed to "focus participants on the profitibility of AEP Energy Services, Inc., enhance shareholder value and provide Participants with an equity participation sufficient to attract, motivate, and retain qualified executives." Plaintiff was a participant in the PEP from the beginning of his employment through June 30, 2002, the date on which the PEP terminated.

Additionally, during Plaintiff's employment with the Company, Plaintiff became eligible to participate in the AEP System Incentive Compensation Deferral Plan ("ICDP"). The ICDP, established by the Company and effective as of January 1, 2001, is an employee pension benefit plan within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* The purpose of the ICDP is to allow certain high-ranking Company employees to defer all or a portion of the incentive compensation they receive for tax deferral purposes.

Section 7.1 of the ICDP provides that "payment of a participant's or a former participant's account shall be made within 60 days of termination of employment." Furthermore, a participant may elect to have deferrals paid in the form of installments, but such election shall not apply if the participant terminates employment for reasons other than retirement, disability, or death. In August 2001, Plaintiff became eligible to participate in the ICDP, and on August 25, 2001, he elected to defer 90% of his PEP compensation, which would have been otherwise payable in the third quarter of 2002, by rolling it into the ICDP. The remaining ten percent of Plaintiff's PEP compensation was to be paid under the terms of the PEP. On June 30, 2002, the date the PEP terminated, Plaintiff received that ten percent of his PEP compensation as taxable income.

On October 8, 2002, the Company fired Plaintiff after he admitted to engaging in false

2

reporting of energy trading transactions to industry publications.[1]  Subsequent to his termination, on December 6, 2002, Plaintiff made a claim for $2,057,514.72 from the ICDP that he had accrued in deferred compensation.  In denying Plaintiff's claim for the benefits, the Company asserted that had it been aware of Plaintiff's misconduct before June 30, 2002, it would have terminated him at that point, thus foreclosing any interest he had in the PEP.

On January 2, 2003, Plaintiff appealed the denial of benefits under the ICDP to the ICDP Committee, a committee responsible for the administration and interpretation of the ICDP.  The ICDP Committee is composed of the Senior Vice President - Human Resources (Defendant Ackerman), the Executive Vice President - Shared Services (Defendant Hagan), and the Executive Vice President - Finance and Analysis (Defendant Fayne[2]).  The ICDP Committee met on February 28, 2003 to review the denial of Plaintiff's benefits.  The Committee concluded that because Plaintiff remained an employee after June 30, 2002, the amount payable to him under the PEP was not forfeited.  The ICDP Committee further held that though Plaintiff was entitled to benefits under the ICDP, it "[did] not intend to waive any rights or claims that American Electric Power may have against Mr. Foley."

---

[1]Plaintiff admitted to submitting inaccurate trade information to "Inside FERC," a publication that uses trade information to establish benchmark prices for the settlement of gas trades throughout the industry.  Such inaccurate reporting occurred on numerous occasions from a period sometime in 2000 through perhaps as late as April or May of 2002.  Foley instructed his subordinates to provide Inside FERC with fictional deals at fictional prices in an attempt to "counteract false reporting by other market participants."
    Notably, Plaintiff and Defendants agree that Plaintiff accurately reported his trades within the Company.

[2]Defendants allege that Defendant Fayne is entitled to judgment in his favor on the independent ground that he was sued on the mistaken belief that he was a member of the ICDP Committee when Plaintiff's claim for benefits was considered.  Defs.' Mem. Supp. at 1 n.1.  Defendants assert that Susan Tomasky, not Defendant Fayne, was the Executive Vice President - Finance and Analysis during the relevant time period.  *Id*. at 7–8.  Accordingly, any claim against Defendant Fayne in his capacity as the Executive Vice President - Finance and Analysis in this case is dismissed.

On March 4, 2003 Defendants sent Plaintiff its decision letter and a separate letter, informing Plaintiff that the Company owed him nothing.  The separate letter stated that the Company had determined it had a right to off-set for the damages that Plaintiff's conduct caused to the Company, and that the amount of those damages far exceeded the amount of Plaintiff's claim.

Plaintiff never received any additional money from Defendants.

### B.  Procedural History

Plaintiff filed a complaint (the "Complaint") against Defendants on April 11, 2003.  The Complaint seeks to recover the benefits under the ICDP allegedly due to Plaintiff.  Plaintiff alleges that Defendants are liable to him under theories of conversion, constructive trust, breach of fiduciary duty related to the constructive trust, and multiple ERISA violations, including breaches of the fiduciary duties relating to minimum funding standards, trust requirements, and prohibited transactions.  In his Prayer for Relief, Plaintiff seeks the payment of his deferred compensation in the amount of $2,057,514.72 plus interest and accumulation from December 9, 2002, attorney's fees, punitive damages, the immediate funding of the ICDP in compliance with ERISA's minimum funding requirements, and the establishment of a trust for ICDP plan assets. In addition, Defendants have brought three counterclaims against Plaintiff for violation of the faithless servant doctrine, intentional misrepresentation, and unjust enrichment.

Plaintiff and Defendants each filed a motion for summary judgment ("Plaintiff's Motion" and "Defendants' Motion," respectively), as well as responsive memoranda.  Upon completion of the filings, the parties had oral argument on the cross-motions for summary judgment before the Court.  The parties' cross-motions for summary judgment are now ripe for decision.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). In response, the non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993) (citations omitted).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The Court also must interpret all reasonable inferences in the non-movant's favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the non-moving party and must refrain from making credibility determinations or weighing the evidence). The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; however, there must be evidence from which a factfinder reasonably could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (finding summary judgment appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"). Finally, when parties file cross-motions for summary judgment, "the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration

and determination whether genuine issues of material fact exist." *Parks v. LaFace Records*, 329

F.3d 437, 444–45 (6th Cir. 2003) (quoting *B.F. Goodrich Co. v. United States Filter Corp.*, 245

F.3d 587, 593 (6th Cir. 2001).

## IV. ANALYSIS

As a threshold matter, it is uncontroverted that the ICDP is a "top hat plan" under

ERISA.  Top hat plans are subject to limited provisions of ERISA:

> ERISA's coverage provisions, 29 U.S.C. §§ 1003, 1051, 1081, and
> 1101, state that ERISA shall apply to any employee benefit plan,
> other than listed exceptions.  One of these exceptions, known as a
> top hat plan, is defined as: "a plan which is unfunded and is
> maintained by an employer primarily for the purpose of providing
> deferred compensation for a select group of management or highly
> compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3),
> 1101(a)(1).  Top hat plans are exempt from the participation and
> vesting provisions of ERISA, 29 U.S.C. §§ 1051-1061, its funding
> provisions, 29 U.S.C. §§ 1081-1086, and its fiduciary responsibility
> provisions, 29 U.S.C. §§ 1101-1114, though not from its reporting
> and disclosure provisions, 29 U.S.C. §§ 1021-1031, or its
> administration and enforcement provisions, 29 U.S.C. §§
> 1131-1145.

*Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283, 286–87 (2nd Cir. 2000);

*see also Peters v. The Lincoln Electric Co.*, 285 F.3d 456, 467 n.10 (6th Cir. 2002) (discussing

the extent to which top hat plans are exempt from ERISA's regulatory scheme).  Here, since

Plaintiff concedes that the ICDP is a top hat plan, most of Plaintiff's claims are not cognizable

under ERISA, including breaches of the fiduciary duties relating to minimum funding standards,

trust requirements, and prohibited transactions.  Thus, Plaintiff's sole claim for relief pursuant to

ERISA exists under the statute's administration and enforcement provisions, 29 U.S.C. §§ 1131-

1145.

Moreover, to the extent Plaintiff seeks to recover money under the ICDP, Plaintiff's

allegations under state law are preempted by ERISA.  Congress, in enacting ERISA, provided

that the statute "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  ERISA § 514(a), 29 U.S.C. § 1144(a); *Warner v. Ford Motor Co.*, 46 F.3d 531, 532 n.2 (6th Cir. 1995).  Section 502(a)(1)(B) of ERISA states that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"  29 U.S.C. § 1132(a)(1)(B).  The purpose of § 502(a) is to provide beneficiaries with a cause of action to enforce their ERISA contracts.  *See Warner*, 46 F.3d at 535; *see also Martin v. Gen. Motors Corp.*, 753 F. Supp. 1347, 1358 (E.D. Mich. 1991) (ERISA's civil enforcement provisions completely preempt state law causes of action "with respect to both persons who are actually 'participants' or 'beneficiaries' of employee benefit plans and persons who *claim* to be 'participants' or 'beneficiaries' of employee benefit plans."  (emphasis in original.)).  In this case, Plaintiff's state law claims of conversion, constructive trust, and breach of fiduciary duty relating to the constructive trust, all stem from Plaintiff's participation in the ICDP.  As such, they are preempted by ERISA, and Plaintiff's sole remaining claim is under § 502(a)(1)(B) of ERISA, codified as 29 U.S.C. § 1132(a)(1)(B).

### A.  Plaintiff's Claim for Benefits Under Section 502(a)(1)(B) of ERISA

Plaintiff submits that he is entitled to recover his benefits from the ICDP pursuant to contract law.  Specifically, Plaintiff argues that Defendants failed to draft provisions in the ICDP

that would give them the authority to forfeit or off-set Plaintiff's compensation.[3]  Looking to the

terms of the ICDP,[4] Plaintiff notes the absence of any forfeiture or alienation provisions,[5] and

argues that ambiguous contract language must be construed against its drafter.[6]  *Goldstein v.*

*Food, Folks & Fun, Inc.*, 2003 U.S. Dist. LEXIS 16432, 6–7 (D. Ohio, 2003).  Further, Plaintiff

contends that Defendants' initial actions regarding Plaintiff's deferred compensation indicate

Defendant's intent to withhold Plaintiff's compensation illegally.  Plaintiff refers to various post-

termination correspondences with Janet Holiday, the Company's Senior Executive Benefits

Consultant, in which Holiday never indicated that Plaintiff's entitlement to his benefits was in

question.  According to Plaintiff, Holiday assured him that the benefits would be paid.

Additionally, Plaintiff notes that he received documents indicating that his participation interest

had been deposited into his bank account, although the deposit was never reflected in his bank

---

[3]Another argument Plaintiff advances in his Reply Brief relates to Income Tax Regulations.  After acknowledging that there is no regulatory guidance under ERISA, Plaintiff cites the Income Tax Regulations interpreting the minimum vesting standards of ERISA, which define the term "nonforfeitable" as "a right which, at a particular time, is conditioned under the plan on a later event, performance, or forbearance which will cause the loss of that right, is a forfeitable right at that time." 26 CFR § 1.411(a)-4(a); 26 CFR § 1.411(a)-4T(a).  As the Court has noted, the ICDP, a qualified top hat plan under ERISA, is not subject to the minimum vesting standards of ERISA.  Therefore, Plaintiff's argument invoking the Income Tax Regulations is not well-taken.

[4]Plaintiff offers some discussion of the terms of the PEP.  The employee benefits plan concerned here, however, is the ICDP, not the PEP.  Therefore, the Court will not address Plaintiff's arguments involving the contract language within the PEP.

[5]Plaintiff cites Section 7.1 of the ICDP, which reads as follows:

> Upon a participant's or a former participant's termination of employment with the company for any reason other than retirement or disability, the [C]ompany shall pay the participant or the former participant the full amount credited to the participant's or former participant's account.  The payment shall be made within 60 days of the participant's or former participant's termination of employment.

[6]Pl.'s Mem. Supp. at 16.

account statement.  Plaintiff maintains that these communications help prove that Defendants breached the terms of the ICDP in a feeble attempt to modify retroactively or to interpret the ICDP without having the authority to do so.

Conversely, Defendants assert that the absence of language in the ICDP expressly forbidding forfeiture or setoff entitled them to withhold payment to Plaintiff based upon his disloyal and injurious conduct.  Under Defendants' interpretation of the ICDP, Plaintiff had merely an unsecured claim to benefits to be paid from the Company's general assets. Additionally, in speaking of the conduct for which Plaintiff was terminated,[7] Defendants mention that such conduct is contrary to the Company's published rules of conduct, ethical guidelines, common sense, and federal law.  Plaintiff's conduct also subjected the Company to what Defendants deem are serious consequences, including an immediate drop in its stock price, resulting in a loss of one billion dollars in market capitalization, substantial reduction in overall trading activity and trading revenue, and a lengthy government investigation into the Company's trading practices.  Since Plaintiff was a disloyal employee and the ICDP does not expressly prohibit forfeiture, Defendants maintain that the Company is entitled to refuse to pay Plaintiff benefits under the ICDP.

The resolution of Plaintiff's ERISA claim turns on the issue of how the Court should interpret the ICDP, given that it does not include a provision affirmatively authorizing forfeiture or setoff.  Since top hat plans are exempt from much of ERISA, including the non-forfeiture and non-alienation provisions,[8] *Carson v. Local 1588, Int'l Longshoreman's Assn.*, 769 F.Supp. 141,

---

[7]Plaintiff was fired for misreporting trade information to outside trade publications.

[8]The rationale for the excluding top hat plans from many of the protective statutory provisions is that top hat plans, by definition, only apply to top management and other highly compensated employees.  Presumably, employees who are eligible to participate in top hat pension plans would be able to use their elevated bargaining position to negotiate such

144 (S.D.N.Y. 1991), contract principles, applied as a matter of federal common law, govern

disputes that arise with respect to plan administration and enforcement.  *See Kemmerer v. ICI*

*Americas, Inc.*, 70 F.3d 281, 287 (3rd Cir. 1995); *In re Carlyle*, 242 B.R. 881, 891 (Bankr. E.D.

Va. 1999).  Under the federal common law of contracts, contracting parties may expressly

preclude setoff between them by agreement, but a waiver of setoff "cannot be inferred from

equivocal language nor deduced from ambiguous expressions."  *Carlyle*, 242 B.R. at 892 ("Few

cases have found contractual language to be sufficiently specific and precise to constitute a

waiver of setoff.").  After the court reviewed provisions of the top-hat plan at issue in *Carlyle*, it

found the following:

> The language of the Retirement Plan, which provides that '[t]he
> right of the Officer as any other person to the payment of a benefit
> hereunder shall not be assigned, transferred, pledged, encumbered
> or subject to any form of attachment,' is too imprecise to find it as
> a bar to offset.  Rather, it appears to be language of a standardized
> nature found in all ERISA plans to prevent the imposition of an
> immediate taxable event upon the participation.

*Id*. at 893.  Contractual language must be clear and explicit in explaining the intent of the parties

to preclude setoff between them.  *Id*. at 892.  In the absence of an express prohibition of setoff,

the federal common law of contracts authorizes an offsetting of one party's contractual

obligation to the other.

As to the issue of forfeiture, courts have held that if a top-hat plan does not contain a

non-forfeiture agreement, then an employer may withhold that portion of benefit plan payment

that accrued during periods of employee disloyalty.  *Aramony v. United Way of Am.*, 28 F. Supp.

---

protection for their plans on their own.  As such, they do not need the protection of the
comprehensive ERISA framework, which is primarily aimed at lower echelon employees.
The non-forfeiture and non-alienation provisions of ERISA are codified at 29 U.S.C. §§
1051-1061, which, as stated above, do not apply to the ICDP.

2d 147, 171 (S.D.N.Y. 1998)[9] ("Under the federal common law of forfeiture, which is derived from the consensus approach of state courts, employees cannot recover non-vested pension benefits that accrued during periods of disloyalty."); *Carson*, 769 F. Supp. at 144 ("Presumably, when the strict non-forfeiture and non-alienation principles surrounding ERISA are not applicable [as in top hat plans], a pension benefit is forfeitable.").[10] Ohio law is consistent with this interpretation. *See, e.g., Roberto v. Brown Cty. Gen. Hosp.*, 571 N.E.2d 467, 469 (Ohio Ct. App. 12th Dist. 1989) (holding that "[a] contract of employment implicitly contains an agreement that the employee will act in good faith and will not act to the detriment of his employer" and that "dishonesty and disloyalty on the part of an employee which permeates his service to his employer will deprive him of his *entire agreed compensation*, due to the failure of such employee to give the stipulated consideration for the agreed compensation." (emphasis in original)).

During oral argument on the parties cross-motions for summary judgment, Plaintiff relied upon *Fields v. Thompson Printing Co.*, 363 F.3d 259 (3rd Cir. 2004), which he contends is controlling here. In *Fields*, the plaintiff was the CEO of Thompson Printing Company ("TPC"). An employment contract that contained a non-forfeiture clause in favor of Fields[11] governed his

---

[9]*aff'd in part, rev'd in part and remanded on other grounds, Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140 (2nd Cir. 1999). In *Aramony*, the court ruled that the plaintiff-employee was entitled to benefits under one top hat plan (the Replacement Benefit Plan or "RBP"), which contained an express non-forfeiture clause, but the defendant-employer had a right of setoff under a second top hat plan (the Supplemental Benefit Agreement or "SBA"), which did not contain an express non-forfeiture provision. *Id.* at 155, 171.

[10]In *Carson*, the court held that the defendant-union could estop the plaintiff-employee from receiving a pension under the plaintiff's top-hat pension plan for an injury plaintiff caused to the defendant since top-hat pension plans are not subject to the non-forfeiture and non-alienation provisions of ERISA. 769 F. Supp. at 145.

[11]The non-forfeiture clause in the employment contract between Fields and TPC provided that "[t]his contract shall be non-terminable by Thompson [Printing Company]. In the event

post-retirement employee benefits and compensation. *Id*. at 263.When three female TPC employees alleged that Fields had sexually harassed them, TPC terminated Fields' employment and, based upon public policy, refused to pay Fields any further compensation under his employment contract. *Id*. In construing the employment contract, the Third Circuit held that Fields was entitled to post-termination benefits and compensation because the contract did not include a conduct-related exception to its express non-forfeiture clause. *Id*. at 270. The court further held that it was unwilling to "look past the plain language of a relatively straightforward contract" and read such an exception into the employment contract based upon TPC's public policy argument. *Id*. at 268.

In this case, the Court finds that the ICDP does not contain an effective waiver of setoff, and Defendants may apply a setoff of Plaintiff's ICDP benefits earned during periods of Plaintiff's disloyalty to the Company. The parties agree that the ICDP, like the SBA in *Aramony*, the Retirement Plan in *Carlyle*, and the pension plan in *Carson*, is a top hat plan that is not subject to the non-forfeiture and non-alienation provisions of ERISA. Accordingly, the federal common law of contracts governs whether Defendants may offset Plaintiff's benefits under the ICDP. Under federal common law, contracting parties are not barred from offsetting one party's obligations to the other absent an explicit waiver of setoff between them. The plain language of Section 7.1 of the ICDP, like the relevant provision of the Retirement Plan in *Carlyle*, is too imprecise to constitute a complete bar to setoff. *Carlyle*, 242 B.R. at 893–94 (finding that contract language that provided that "[t]he right of the [e]mployee or any other person to the payment of benefits under this Agreement shall not be assigned, transferred,

---

Thompson [Printing Company] shall terminate the employment of Jerry [Fields], all of the benefits as contained herein shall continue in accordance with the terms and provisions of this agreement." *Fields*, 363 F.3d at 263. The employment contract in *Fields*, however, did not differentiate between termination with or without cause. *Id*.

pledged or encumbered except by will or by the laws of descent and distribution" fails to express a sufficiently concrete intention to prohibit setoff).  Therefore, the contract language of the ICDP does not preclude setoff.

Under *Aramony*, Plaintiff cannot recover his ICDP benefits that accrued during periods of disloyalty.  Contrary to Plaintiff's argument, *Fields* is inapposite because the employment contract in that case contained a non-forfeiture clause, while the ICDP does not.  *See Fields*, 363 F.3d at 263.  No language in the ICDP provides for the non-forfeiture of benefits.  The essential holding of *Fields* is that the court was unwilling to read an implicit conduct-related exception into a contract's express non-forfeiture clause.  *See id.* at 268.  Similarly, this Court will not read a setoff waiver into the ICDP when no such waiver was expressly provided.  Aside from Plaintiff's discussion of *Fields*,[12] which can be distinguished from this case due to the absence of an express non-forfeiture provision in the ICDP, Plaintiff does not rely upon any authority for its proposition that top hat plans are only subject to setoff if there are express provisions authorizing it.  Accordingly, since the ICDP contains neither a non-forfeiture clause nor a waiver of setoff, Defendant is entitled to offset Plaintiff's ICDP benefits to account for the amount of such benefits that Plaintiff accrued during periods of disloyalty to the Company.

Therefore, Plaintiff's Motion for Summary Judgment as to its claim for benefits under section 502(a)(1)(B) of ERISA is **DENIED**.  Defendants' Motion for Summary Judgment is **GRANTED** to the extent that Defendants have a right to setoff against Plaintiff's accrued ICDP benefits any amount of such benefits Defendants prove Plaintiff accrued during periods of disloyalty to the Company.  As a predicate to any setoff, however, Defendants must first prove

---

[12]*Fields* is also distinguishable from this case in that the plaintiff in *Fields* was fired due to <u>alleged</u> misconduct.  Here, Plaintiff <u>admitted</u> to falsely reporting trades to outside trade publications.  This difference between the two cases is not insignificant.

that Plaintiff was disloyal to the Company.[13]  Then, Defendants must prove the amount of

Plaintiff's ICDP benefits that accrued during any period of such disloyalty.

## B.  Defendants' Counterclaims

In its Answer, the Company raised three state law counterclaims to Plaintiff's Complaint:

a violation of the faithless servant doctrine, intentional misrepresentation, and unjust

enrichment.[14]  The Company now moves for summary judgment based upon those

counterclaims.  Each counterclaim will be discussed seriatim.

### 1.  Faithless Servant Doctrine

As stated above, the Company may setoff against amounts payable to Plaintiff under the

ICDP for any time period in which the Company can prove Plaintiff was disloyal, pursuant to the

"faithless servant doctrine."  In Ohio, courts have adopted the "faithless servant doctrine"

enunciated by the Kansas Supreme Court, which provides the following:

> [D]ishonesty and disloyalty on the part of an employee which
> permeates his service to his employer will deprive him of his *entire
> agreed compensation*, due to the failure of such an employee to
> give the stipulated consideration for the agreed compensation.
> Further, as public policy mandates, an employee cannot be
> compensated for his own deceit or wrongdoing.  However, an
> employee's compensation will be denied only during his period
> of faithlessness.

---

[13]In section IV.B.1. of this Opinion, *infra*, the Court finds that there is a genuine issue of material fact of whether Plaintiff's false reporting constitutes disloyalty to the Company under the "faithless servant doctrine."

[14]Plaintiff alleges that the Company's state law counterclaims should be preempted by section 514(a) of ERISA, which states that the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  Pl.'s Mem. Opp'n at 9–10 (citing 29 U.S.C. § 1144(a)).  The Court disagrees.  First, the Company's counterclaim based upon the faithless servant doctrine arises out of federal common law, which governs the enforcement and administration of top hat pension plans.  Second, with respect to the Company's state law counterclaims based upon intentional misrepresentation and unjust enrichment, they do not "relate to any employee benefit plan" since they seek recovery of, *inter alia*, all compensation paid to Plaintiff generally.

*Roberto*, 571 N.E.2d at 469 (citing *Bessman v. Bessman*, 520 P.2d 1210 (Kan. 1974)) (Emphasis in original).  In *Roberto*, the court held that, under the faithless servant doctrine, an employer was entitled to withhold three years of deferred compensation from a hospital administrator who had embezzled from the hospital.  *Id*.  Other courts have similarly interpreted the faithless servant doctrine.  *See, e.g., Goal Systems Int'l, Inc. v. Klouda*, No. 84AP-168, 1985 WL 10461 (Ohio Ct. App. 10th Dist. Oct. 10, 1985) (affirming an award for an employer for a portion of a disloyal employee's salary when, following his termination from employment, the former employee, a program developer, tried to market his computer program through a competitor); *Hey v. Cummer*, 97 N.E.2d 702 (Ohio Ct. App. 8th Dist. 1950) (affirming an award for an employer of an employee's entire compensation when the employee profited secretly at the expense of employer); *Aramony*, 28 F. Supp. 2d at 176 (interpreting New York state law, ruling that a disloyal employee forfeits his right to compensation for services performed during a period of disloyalty, even if the employee's services have been, on balance, beneficial to the employer).

In this case, the Company alleges that Plaintiff's reporting of inaccurate trade information to Inside FERC violated the Company's standards of ethical business practices and its Corporate Code of Conduct.  The Company moves this Court to apply the faithless servant doctrine and to order Plaintiff to forfeit all of his compensation, irrespective of whether it is deferred, that was credited to or paid to him during his period of disloyalty, dishonesty, and lack of fidelity.  The Company argues that the time period of disloyalty runs from early 2000 through Plaintiff's termination, since Plaintiff admitted that "he began to routinely misreport trades to Inside FERC early in 2000 and continued to do so and/or to conceal his having done so until October 2002."  Defs.' Reply Mem. at 11.  Accordingly, the Company contends that it is entitled to retain the $2,057,514.72 from Plaintiff's ICDP account and also recover the more than $1.5 million it paid to Plaintiff in salary from January 1, 2000 through the end of his employment.

15

Plaintiff asserts that the faithless servant doctrine should not apply here because:  (1) Plaintiff did not personally gain from disclosing inaccurate trade information to outside publications; (2) the Company had no specific procedures in place concerning the reporting of trades to outside publications; and (3) Plaintiff's inaccurate reporting did not "permeate his service" to the Company.  First, Plaintiff alleges that Ohio cases invoking the faithless service doctrine typically involve cases in which an employee took money directly from the employer.[15] Plaintiff alleges that, in contrast, his actions were not designed to harm the Company and were done in an effort to compensate for a lack of market information.  Second, Plaintiff argues that, prior to October 2002, the Company had not implemented any rules specifically concerning the proper procedures for reporting trades to trading publications.  Third, Plaintiff contends that since all of his trades were accurately reported to the Company, his actions did not "permeate his service to his employer."  For these reasons, Plaintiff argues that the Company's counterclaim based upon the faithless servant doctrine fails.

On this issue, there remain a number of material issues of fact which are inappropriate for resolution on a motion for summary judgment.  While the Court is persuaded that Plaintiff's actions could potentially trigger the application of the faithless servant doctrine as a matter of law, Defendant has not proffered sufficient evidence to prevail at this stage of the litigation. Plaintiff's assertion that the doctrine only applies when an employee gains personally from his

---

[15]As secondary authority for this point, Plaintiff cites to a comment from Section 469 of the Restatement (Second) of Agency, which sets forth the faithless servant doctrine ("[a]n agent who, without the acquiescence of his principal, acts for his own benefit or for the benefit of another in antagonism to or in competition with the principal in a transaction is not entitled to compensation.").  Pl.'s Mem. Opp'n at 13 (quoting RESTATEMENT (SECOND) OF AGENCY § 469 cmt.a).

actions is incorrect.[16]  There is no requirement that an agent receive a benefit before the faithless

servant doctrine authorizes a forfeiture of the agent's compensation.  The fact that Plaintiff did

not obtain any improper personal benefit from his misreporting to outside publications does not

preclude the application of the faithless servant doctrine.

The Court, however, finds that there is a genuine issue of material fact of whether

Plaintiff, as Director of Energy Trading for the Company's Gulf Desk, should have been aware

of the legal and practical implications of his false reporting.  Also, the Court hesitates to declare

at this early stage that Plaintiff's repeated misreporting of trades to outside publications and

Plaintiff's attempts to conceal his own and his subordinates' misconduct satisfy the permeation

requirement.  Therefore, Defendants' Motion for Summary Judgment as to its counterclaim

under the faithless servant doctrine is **DENIED**.

### 2.  Intentional Misrepresentation

To succeed on a claim of fraud or intentional misrepresentation, a party must prove: (1) a

representation or, where there is a duty to disclose, concealment of a fact; (2) which is material

to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter

disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4)

with the intent of misleading another into relying upon it; (5) justifiable reliance upon the

representation or concealment; and (6) a resulting injury proximately caused by the reliance.

*Russ v. TRW, Inc.*, 570 N.E.2d 1076, 1083 (Ohio 1991); *Wing v. Anchor Media Ltd. of Texas*,

570 N.E.2d 1095, 1099 (Ohio 1991).

---

[16]Plaintiff's citation to Comment (a) of Section 469 of the Restatement (Second) of Agency excludes the portion of Comment (a) that goes on to say that "[a]n agent is entitled to no compensation for a service which constitutes a violation of his duties of obedience. . . . This is true even though the disobedience results in no substantial harm to the principal's interests and even though the agent believes that he is justified in so acting."  RESTATEMENT (SECOND) OF AGENCY § 469 cmt.a.

Plaintiff argues that the Company has failed to provide sufficient evidence to prove the first, fifth, and sixth elements of the counterclaim.  First, Plaintiff asserts that his reasoning for his conduct, when coupled with the lack of physical trades at the Company, does not indicate an intent to mislead, but rather an attempt to correct the misleading activities of others and to compensate for a lack of information.  Second, Plaintiff argues that any reliance by the Company on Plaintiff's reports to outside publications was not justified since, according to Plaintiff, his method of using market indicators to establish information regarding prices was common throughout the industry and was used at the Company before Plaintiff was employed there.  Third, Plaintiff notes that the Company has not shown that it was injured by its reliance on Plaintiff's representation or concealment.

The Company has failed to provide sufficient evidence to prevail on its counterclaim of intentional misrepresentation at summary judgment.  There are genuine issues of material fact as to the extent of Plaintiff's duty to disclose with the Company his reporting activity to outside publications, whether, and to what extent, the Company was aware of reporting practices within the industry and the Company, and whether Plaintiff's conduct was the proximate cause of the Company's injury.  Accordingly, Defendants' Motion for Summary Judgment as to its counterclaim for intentional misrepresentation is **DENIED**.

### 3.  Unjust Enrichment

To prevail on a claim of unjust enrichment, a party must prove (1) a benefit conferred by a plaintiff upon a defendant, (2) knowledge by the defendant of the benefit, and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')."  *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984).  Unjust enrichment is a claim under quasi-contract law that "arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain."  *Id*.

18

(quoting *Hummel v. Hummel*, 14 N.E.2d 923 (Ohio 1938)).

Here, Plaintiff contests that the Company has satisfied the third element of its claim.[17] Specifically, Plaintiff argues that "[i]n light of [Plaintiff]'s belief that his conduct was entirely proper, a belief confirmed in part by the lack of any contrary policy at Energy Services or AEP or contrary direction by management, it cannot be said that [Plaintiff] had any motive to conceal his activities."  Pl.'s Mem. Opp'n at 18.

A genuine issue of material fact on it's the Company's unjust enrichment claim precludes summary judgment.  The Court does not believe that the Company's evidence sufficiently proves that Plaintiff's retention of his compensation during the relevant time period was unjust.  Thus, Defendants' Motion for Summary Judgment as to its counterclaim for unjust enrichment is **DENIED**.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **DENIED**.

Defendant's Motion for Summary Judgment is **GRANTED** with respect to setoff of Plaintiff's

---

[17]The Court will not address Plaintiff's other argument that the Company's unjust enrichment claim is independently barred by the presence of a express contracts, specifically the PEP and the ICDP.  Pl.'s Mem. Opp'n at 19.  The Company's claim does not arise out of either the PEP or the ICDP, but rather out of Plaintiff's employment generally.

ICDP benefits, but **DENIED** with respect to the Company's counterclaims under the faithless servant doctrine, intentional misrepresentation, and unjust enrichment.

  **IT IS SO ORDERED.**

            **__/s/Algenon L. Marbley_____**
            **ALGENON L. MARBLEY, JUDGE**
            **United States District Court**

**DATE: March 7, 2006**